

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00094-CV

_____

NANCY ELIZABETH BOWMAN, Appellant

V.

JERRY DAVIDSON AND DIANA DAVIDSON, Appellees

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 13-0618

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Burgess

# MEMORANDUM OPINION

While visiting the home of Jerry and Diana Davidson, first-time guest Nancy Elizabeth Bowman was bitten in the face by the Davidsons' dog, Bubba. Bowman sustained considerable injury as a result of the bite. She sued the Davidsons and alleged (1) that because they knew or had reason to know of Bubba's dangerous propensities, they were strictly liable for her injuries resulting from the dog's bite and (2) in the alternative, that they were negligent in failing to exercise reasonable care to prevent the dog from injuring her. A jury trial resulted in findings favorable to the Davidsons on both theories of liability. In accordance with the jury's verdict, the trial court entered a take-nothing judgment against Bowman.

On appeal, Bowman argues that she was entitled to a favorable finding on the strict liability issue as a matter of law and, alternatively, that the jury finding was against the great weight and preponderance of the evidence.[1] We overrule Bowman's points of error and affirm the trial court's judgment.

## I. Standard of Review

Bowman argues that she was entitled to a favorable jury finding on the strict liability issue as a matter of law. To prevail, Bowman "must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). In determining whether Bowman has met her burden, we "first examine the record for evidence that supports the finding, while ignoring all evidence to the contrary." *Id.* If no evidence supports the adverse finding, we "then examine the entire record to determine if the

---

[1]Bowman does not contest the jury's findings on the issue of negligence.

contrary proposition is established as a matter of law." *Id.*; *see Armstrong Forest Prods. v. Redempco, Inc.*, 818 S.W.2d 446, 449 (Tex. App.—Texarkana 1991, writ denied). "In considering the evidence, we view it in the light favorable to the verdict and, unless doing so is unreasonable, presume the jury resolved all conflicts in accordance with its verdict." *Johnson v. Enriquez*, No. 08-13-00260-CV, 2015 WL 799461, at *3 (Tex. App.—El Paso Feb. 26, 2015, no pet.) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 819–21 (Tex. 2005)).

Bowman also attacks the jury's verdict on factual sufficiency grounds. When, as here, a party attacks "an adverse finding on an issue on which she [had] the burden of proof [at trial], she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Francis*, 46 S.W.3d at 242. In making this determination, we "must consider and weigh all of the evidence, and [will] set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.* (citing *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986), *overruled on other grounds by Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000)).

## II.    Strict Liability for Dangerous Animals

"An owner of a vicious animal can be strictly liable for harm, while an owner of a non-vicious animal can be 'subject to liability for his negligent handling of such an animal.'" *Bushnell v. Mott*, 254 S.W.3d 451, 452 (Tex. 2008) (quoting *Marshall v. Ranne*, 511 S.W.2d 255, 259 (Tex. 1974)).[2] Thus, "'a possessor of a domestic animal which [the owner] has reason to know has

---

[2]"For strict liability to attach, it is not required that the animal be 'vicious' or aggressive; a finding of the animal's abnormal 'dangerousness' is sufficient." RESTATEMENT (THIRD) OF TORTS, § 23 cmt. c (2010).

dangerous propensities abnormal to its class, is subject to liability for harm caused thereby to others . . . although he has exercised the utmost care to prevent it from doing the harm.'" *Marshall*, 511 S.W.2d at 258 (quoting RESTATEMENT OF TORTS, § 509 (1938)); *see* RESTATEMENT (THIRD) OF TORTS, § 23 (2010).

> The elements of a strict liability claim in this context have been articulated as follows:
>
> To recover on a claim of strict liability for injury by a dangerous domesticated animal, a plaintiff must prove: (1) the defendant was the owner or possessor of the animal; (2) the animal had dangerous propensities abnormal to its class; (3) the defendant knew or had reason to know the animal had dangerous propensities; and (4) those propensities were a producing cause[3] of the plaintiff's injury.

*Thompson*, 127 S.W.3d at 451 (citing *Allen ex rel. B.A. v. Albin*, 97 S.W.3d 655, 660 (Tex. App.—Waco 2002, no pet.)). Only the second and third elements are at issue in this case.

## III. The Evidence at Trial

At trial, the jury was asked to determine whether the Davidsons "[knew] or [had] reason to know that their dog had dangerous propensities not normal for a dog." The jury responded in the negative, and we now examine the record for evidence supporting this finding.

### A. Bubba's General Character and the Davidson's Warnings to Others

Bubba is a twelve-year-old, male, Australian Blue Heeler. He weighs approximately seventy pounds and has had no formal training. Diana testified that Bubba is very protective of her, "is aggressive . . . if he doesn't know someone," is "very verbal when strangers come up," and

---

[3]"Proximate and producing cause differ in that foreseeability is an element of proximate cause, but not of producing cause." *Thompson v. Curtis*, 127 S.W.3d 466, 451 (Tex. App.—Dallas 2004, no pet.) (citing *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex. 1995), *abrogated on other grounds by Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007)).

is known to jump at the fence. The Davidsons posted signs on their property warning others to "beware of the dogs"[4] since "[a] dog will naturally bite." The Davidsons' neighbors and friends were well aware of Bubba's nature; their longtime friends, Billy Strong and Danny Alexander, described Bubba as an aggressive dog. Alexander stated that Bubba barks at everyone "[m]ost of the time." Anita Biggs Scott, another friend of the Davidsons, testified that she would not pick up a napkin if it was dropped in close proximity to the dog. Given Bubba's size and nature, the Davidsons put Bubba away in the presence of children, large crowds, or strangers to the dog.

At trial, Diana admitted that she typically warns guests of Bubba's aggressiveness, protectiveness, and possessiveness and instructs them not to look at, touch, or otherwise bother the dog. She further testified that the purpose behind these warnings is to prevent dog bites. Jerry testified that he also warns people not to touch, look at, or pet Bubba and that the warnings are given so that others can avoid being bitten by him. Strong, Scott, and other frequent visitors, including Nancy George, Gladys May Phant, and Sherry Rushing, all testified that newcomers are warned by Diana and Jerry not to touch Bubba or stare him in the eyes. Strong, Alexander, and Scott also personally issued similar warnings to new visitors during gatherings at the Davidsons' home. Despite the typical warnings, some of the Davidsons' guests pet Bubba.[5] Bowman was one of these guests.

---

[4]The Davidsons have owned several dogs over the years, including Bubba's sister, Sissy.

[5]Scott stated that she pets Bubba, although she is careful to cover her eyes when doing so.

## B.    Bowman Received Numerous Warnings about Bubba

On the night that Bubba bit Bowman, the Davidsons were hosting a fish fry at their home. Bowman, who did not know the Davidsons, was invited to the gathering as Alexander's date. Alexander testified that he warned Bowman several times both before and after they arrived at the party to watch for Bubba, and to avoid touching him or looking at his eyes. Diana greeted Bowman and, for Bowman's safety, "asked her. . . if she had a problem with the dogs." Diana testified that "[Jerry] was getting up to put [Bubba] in the house," but that Bowman "[s]aid it wasn't necessary. That she was not afraid of [dogs]. She liked dogs[,] and they liked her." Diana then informed Bowman, "[I]f you don't touch them, you know, or look at them they will not bother you." Scott testified that she also issued these usual warnings to Bowman at the party.

Bowman's testimony established that she was informed that Bubba was so possessive of Diana that Jerry could not dance with her because Bubba would get between them. She also claimed, "[Jerry] just in general conversation said [jokingly] that he couldn't hug Ms. Davidson and get close to her because Bubba would get in between them." Although Bowman acknowledged that she was warned of Bubba's possessiveness, she did not heed the warnings.

Scott testified that he witnessed Bowman coaxing Bubba to come to her and again warned Bowman that beckoning Bubba was not a good idea. Bowman testified that Bubba came over to her and put his head on her knee, prompting her to pet him. According to Alexander's account, Jerry, Diana, Scott, and Halle Biery all warned Bowman not to touch Bubba both before and after she did so. Bowman said that Bubba laid down beside her and then walked back to Diana. By all

6

accounts, including Bowman's, Bubba did not exhibit any aggressive or concerning behavior before the bite.

### C.   The Bite

When it was time to enjoy the fried fish, Bowman sat next to Diana at the dinner table, with Bubba on the floor between them. Bowman testified, "I asked Ms. Davidson could I feed [Bubba] a French Fry. I don't recall her saying anything. . . . I saw her shake her head yes." Jerry testified that he heard Diana tell Bowman that Bubba did not like french fries and that it was probably best not to feed him. Bowman fed Bubba a french fry. Witnesses to the accident impliedly questioned whether Bowman was attacked as a result of sharing her meal. Diana testified that Bowman was bent over looking towards the floor when Bubba bit her. Scott, Squire, and Biery also testified that Bubba bit Bowman when she leaned down at the table. Strong testified that Bowman had turned and was looking at Bubba's face when the dog jumped up and bit her.

Bowman denied that she was feeding Bubba at the time of the bite. According to Bowman, she dropped the french fry on the ground and then turned to Diana to compliment her on the table setting when Bubba jumped up and bit her in the face. Bowman's friend, Clay Armstrong, testified that on the following day, Bowman informed him that she had "leaned over to say something to [Diana] . . . when . . . the dog bit her in the face." Strong testified that she disbelieved Bowman's account because she witnessed Bowman's head duck down past the tabletop.[6]

---

[6]According to Bowman, Strong, Alexander, and Squire, Bubba did not bark or make any noise before the attack but Biery testified that she heard the dog bark.

7

Alexander immediately drove Bowman to a hospital; she received emergency medical treatment for her injuries. The bite permanently damaged Bowman's facial nerve endings, causing chronic pain, and also disfigured her lip, making it difficult to eat. Bowman consulted with Dr. Kenneth Wayne Sanders, a plastic surgeon, who suggested that surgery might repair Bowman's disfigured lip line.

## D. Evidence of a Previous Incident

Most of the Davidsons' friends, including George,[7] Alexander, Scott, and Squire, testified that they had not seen Bubba act out aggressively toward a human and that they could not believe that Bubba bit someone.[8] Diana testified that she did not know why Bubba bit Bowman and that Bubba had never bitten anyone before. Yet, the record established that Bubba had previously displayed aggressive behavior toward Strong.

Strong had been around Bubba on many occasions and was familiar with and to the dog. When asked whether Bubba had ever bitten anyone before, Strong said that Bubba had bitten him one year before Bowman's bite. Strong testified that Bubba ran towards him and "nip[ped] [him] on the back of [his] leg" as he was rushing out of the Davidsons' front door. Strong characterized the incident as a "nip" that left a bruise, but did not break the skin. Diana witnessed the incident and scolded Bubba to let go of Strong. The dog obeyed. Diana testified that Bubba "pinch[ed]"

---

[7]George testified that she had previously been bitten by a Blue Heeler.

[8]Bubba's veterinarian, Dr. Bruce Bradley, testified that his records did not indicate that Bubba was aggressive towards him or others during his veterinary visits. Jerry testified that Bubba was muzzled when he went to his veterinarian appointments.

Strong because he "just moved too fast." Strong testified that the Davidsons should have put Bubba away to avoid the bite to Bowman.

### E. What the Davidsons Knew or Should Have Known

Diana admitted the Bubba "laid teeth on Mr. Strong, a human being." She claimed that she had been warning people for a long time about Bubba's aggressiveness, protectiveness, and possessiveness and that she just did not know when or if the dog might show aggressiveness or bite someone. Diana admitted that she had reason to know that Bubba could be dangerous and might bite someone and also agreed that she knew Bowman might be bitten unless Bubba was put away.[9] Yet, according to Diana, Bowman was at fault for the bite because she did not insist on having Bubba banished from the party. During her later testimony, Diana claimed that Bubba was "absolutely not" vicious and dangerous.

Jerry agreed that Bubba was protective, but denied that the dog was aggressive. Jerry's initial testimony regarding Bubba's propensity for danger is contained in the following excerpt:

> Q    Then a biting dog is potentially dangerous?
>
> A    Not necessarily.
>
> Q    Or has a potential or the possibility?
>
> A    Possibility.

---

[9] Citing to *Mendoza v. Fidelity & Guaranty Insurance Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex.1980), Bowman also argues in a reply brief that Diana's uncontroverted testimony "[rose] to the level of a judicial admission." The record does not establish that Bowman made this argument below. Also, Bowman did not raise this argument in her first appellate brief. Moreover, *Mendoza* states, "A party's testimonial declarations which are contrary to his position are quasi-admissions. They are merely some evidence, and they are not conclusive upon the admitter." *Id.* We recognize that *Mendoza* goes on to identify the circumstances under which quasi-admissions are treated as judicial admissions, yet the third requirement is that the statement be "deliberate, clear, and unequivocal." *Id.* (citing *United States Fid. & Guar. Co. v. Carr*, 242 S.W.2d 224, 229 (Tex. Civ. App.—San Antonio 1951, writ ref'd)). Diana's statement here does not rise to the level of the "deliberate, clear, and unequivocal" statement necessary to constitute a judicial admission that her dog was dangerous.

Q       Okay.  How about propensity?

A       I don't even know the meaning of the word.

Q       Propensity means that he is leaning that way and you gave warnings because you thought that he might bite; correct?

A       Maybe so.

Later, Jerry testified several times during his examination, including in the following excerpt, that

Diana warned others about Bubba because there was a propensity for danger:

Q       Okay. And the mere fact of somebody leaning toward Diana, as far as we know, that could set the dog off?

A       Right.

Q       We just don't know what?

A       We don't know what.  We don't know what set him off that night. It hasn't happened again.

Q       Okay.  Well, that is why you gave the warnings is because you knew that the propensity was there for it to happen?

A       Yes, that is the reason that they give the warning.

Q       Okay.  And the warnings were to try to prevent what happened from happening?

A       Right.

When asked about the incident with Strong, Jerry testified, "I am not really sure that he laid teeth

on [Strong]."

**F.      The Experts' Testimony**

In an attempt to explain some of his behavior, Diana stated that Bubba was used to herd cattle at one time.  Bubba's vet, Dr. Bruce Bradley, testified that as a heeler, there was a natural tendency for Bubba to have a herding instinct.  However, he clarified that a heeler might nip a cow or a horse, but was not likely to "nip" people.  Bradley testified that he would have put an aggressive dog away when people came over.

John Charles Laughlin, an engineer, was asked to "perform a hazard mitigation analysis and a human factor analysis to determine whether or not the Davidsons took appropriate measures on the date of the incident."  Laughlin's expert conclusion was that the Davidsons could have removed the potential for Bubba to bite someone by simply putting him away.  Laughlin also testified that it was irresponsible for the Davidsons to have allowed Bubba to sit next to a stranger at the dinner table.

Dr. Lore I. Haug, a board-certified veterinarian behaviorist, provided her expert testimony after reviewing the depositions taken by both parties during discovery.  Noting that the Davidsons had spent years warning people about Bubba, and not their other dog, Sissy, Haug testified, "When people give warnings about their dog . . . it is because they have some knowledge about the dog's previous behavior that makes them concerned that something bad is going to happen."  Haug testified that a dog can become so protective and possessive that it becomes dangerous, and that "[i]n the vast majority of cases the behavior persists or worsens over time" unless the owners correct the dog's behavior.  She stated that a poorly socialized animal could react after finding a person's stare threatening.  According to Haug, "In the depositions they said when Jerry got near

11

Diana[,] Bubba barked, jumped on them and pushed between them." Haug testified that Bubba's behavior "does not fall within what we would call typical, normal or[,] acceptable for a companion dog."

Haug opined that the Davidsons warned others about Bubba's dangerous character because they knew that Bubba exhibited a tendency to attack human beings or other animals. Haug believed that Bubba had dangerous propensities, which was defined for her by counsel as vicious or aggressive tendencies that are not normal for a dog. When asked if the Davidsons knew or had reason to know that Bubba had propensities to be dangerous, Haug testified that the Davidsons "did have adequate knowledge that something may happen."

Yet, Haug stated that Strong's fast movement could have triggered Bubba's bite[10] because the dog had a nature to herd from behind and that Strong's running could have startled the dog. She testified that Bubba could have injured Strong more severely if he had wanted to. During cross-examination, Haug agreed that prior to Bowman's bite, there was no evidence that Bubba had bitten anyone severely. The Davidsons also elicited the following statements from Haug, which focused on her prior deposition testimony, and likely weighed on the jurors' minds:

> Q       I am going to move briefly to some of your [deposition] testimony. . . . You were asked would you have classified or considered Bubba to be a dangerous dog. You go on basically and say it is difficult in answering and you talk about Bubba's problems and legal definitions and whatnot . . . . On Page 16 [a]t Line eight, you told me your answer was at the time up to the Bowman bite would I have told people he was dangerous, was a dangerous dog, no. . . . However, I would say there were clearly red flags, but the bottom line you said no. I would not have considered him dangerous up until the time he bit Ms. Bowman. Do you still agree with that testimony?

---

[10]Haug testified that she considered any contact that a dog made with its mouth to constitute a bite, even absent injury.

12

A       Yes and no. Can I clarify? I get what you are saying. So this is the proposed question and I am basing my answer on the way dangerous propensities is outlined there. Okay.

[Davidsons counsel]: Your Honor, I would object to the responsiveness to the answer. My question was: Does she still agree with her prior opinion, her statement. That is a yes or no.

THE COURT: That objection is sustained.

Q[Mr. Brown]: So is your answer now yes and no as opposed to no, which is what you told me on deposition?

A       I would say no with a qualifier.

Q       Okay. Good enough. There is a potential in most any dog to bite?

A       Correct.

Q       Under the right circumstances and conditions whatever any -- most any dog might bite someone; agree?

A       Yes.

## G.      The Jury's Finding

On the issue of strict liability, the trial court submitted the following question and instructions to the jury:

On the occasion in question, did the Davidsons know or have reason to know that their dog had dangerous propensities not normal for a dog[?]

"Reason to know" means the actor has information from which a person of reasonable intelligence would infer that the fact in question exists, or that such person would govern his conduct under the assumption that such fact exists.

It is enough that the possessor of the animal knows that it has on other occasions exhibited such a tendency to attack human beings or other animals or otherwise to do harm as should apprise him of its dangerous character. Thus, the fact that a dog has to his knowledge unsuccessfully attempted to attack human

13

beings or other animals is sufficient to bring its possessor within [the] knowledge requirement. Sufficient also is any form of ill temper displayed in the presence of man or beast which would apprise a reasonable man that the animal if uncontrolled would make such an attack.

"Dangerous propensities" means vicious or aggressive tendencies that are not normal for a dog.

> Answer "Yes" or "No."
> Jerry Davidson     _____
> Diana Davidson    _____

Favoring the Davidsons, the jury wrote "No" in both blanks.

## IV. The Jury's Strict Liability Finding Is Supported by Legally Sufficient Evidence And Is Not Against the Great Weight and Preponderance of the Evidence

Pointing to the warnings issued by the Davidsons to others, Haug testified that the Davidsons "did have adequate knowledge that something may happen." Yet, "in a dog bite case[,] the controlling issue to be determined is whether the party complained against has knowingly kept or harbored a vicious dog." *Arrington Funeral Home v. Taylor*, 474 S.W.2d 299, 300 (Tex. Civ. App.—Eastland 1971, writ ref'd n.r.e.). Certainly, given the facts before us, the answer to this question likely required considerable deliberation. By its finding, the jury determined that prior to Bubba's attack on Bowman, the Davidsons did not know and should not have known that Bubba had dangerous propensities abnormal to his class. In reviewing the jury's verdict, we must recognize that the jury is the "sole judge of the credibility of the witnesses and the weight to be given their testimony, and we may not act as a thirteenth juror in assessing the evidence and the credibility of the witnesses." *Lesikar v. Rappeport*, 33 S.W.3d 282, 296 (Tex. App.—Texarkana 2000, pet. denied).

14

Bubba is a large, vocal dog who barks "at most everybody . . . [m]ost of the time." While the jury heard uncontested testimony about Bubba's possessiveness and protectiveness of Diana, it heard conflicting testimony about his aggressiveness. Although Diana and several other witnesses used the word "aggressive" to describe Bubba, those same witnesses who had been around Bubba on many occasions (with the exception of Strong), stated that they never saw Bubba acting aggressively toward another person. Jerry denied the idea that Bubba was an aggressive animal. From the record, the jury was required to determine whether the incident with Strong established that Bubba had dangerous propensities, or whether he was merely overly-protective and that this incident was atypical.

The characterization of the prior incident with Strong was hotly contested. Bowman, who was not warned that Bubba had a tendency to bite, argued at trial that Bubba's attack on her constituted a second bite. She contends that Bubba's prior incident with Strong established that the Davidsons knew that the dog had "on other occasions exhibited such a tendency to attack human beings . . . as should apprise [them] of [his] dangerous character."

Diana testified that Bubba had never previously bitten anyone. Strong referred to the incident as a nip that did not break the skin, but only left a bruise. Strong further testified that after the nip, Bubba let go. In spite of the incident, Strong continued to interact with Bubba and frequently attended dinners at the Davidsons' home even though Bubba was usually close to the dinner table.

When questioned about the incident involving Strong, Haug testified that any dog could have the potential to bite under the right circumstances and that Strong's fast movement could

have startled the dog. She added that Bubba could certainly have caused more harm to Strong if he wanted to. Further, the jury heard that Haug had previously testified that she would not have described Bubba as dangerous prior to Bowman's bite. While Haug opined that "there [wa]s something about this dog that [prompted the Davidsons] to warn people about him," she stated that she had not seen any evidence of an act that would prompt such warnings.

Viewing the evidence in the light most favorable to the verdict, we conclude that there was some evidence to support a decision that the Davidsons did not know or have reason to know that Bubba was vicious until he bit Bowman. Thus, Bowman cannot establish that she was entitled to a favorable finding on the strict liability issue as a matter of law. We next determine whether the jury's verdict was against the great weight and preponderance of the evidence.

The reason for the imposition of strict liability is explained in the Third Restatement of Torts, which states,

> Given the defendant's knowledge, the reasonableness of the defendant's conduct in retaining the animal is at least questionable, and strict liability gives the owner an incentive to consider whether the animal should be retained. Even if that retention is itself proper, an abnormally dangerous animal is by definition unusual; owning such an animal is an activity engaged in by a few that poses significant risks on others within the community. In these circumstances, strict liability is fairly imposed.

RESTATEMENT (THIRD) OF TORTS, § 23 cmt. b (2010). Thus, "'[t]he owner of a domestic animal is not liable for injuries caused by it in a place where it has a right to be, unless the animal is of known vicious propensities or the owner should know of the vicious or unruly nature of the animal.'" *Searcy v. Brown*, 607 S.W.2d 937, 941 (Tex. App.—Houston [1st Dist.] 1980, no writ) (quoting *Lewis v. Great Sw. Corp.*, 473 S.W.2d 228 (Tex. App.—Fort Worth 1971, writ ref'd

16

n.r.e.)).  Whether a dog has a vicious nature and whether the owner is aware of that nature is a question for the finder of fact.  *See Pate v. Yeager*, 552 S.W.2d 513, 516 (Tex. Civ. App.—Corpus Christi 1977, writ ref'd n.r.e.).

At the time of his encounter with Bowman, Bubba was twelve years old and had been socialized with a number of people.  Prior to the incident involving Strong, there was no evidence that Bubba had previously harmed any person or animal.  Because Haug and Diana both suggested that Bubba could have been startled by Strong's sudden movement, the jury could have determined (1) that the nip was a startled reaction rather than an attack and (2) that prior to Bowman's bite, the Davidsons had no reason to know that Bubba had dangerous tendencies that were not normal for a dog since he had displayed no tendency to attack human beings or other animals.  Thus, based on our review of this record, we cannot conclude that the jury's determination was against the great weight and preponderance of the evidence.  Accordingly, we must overrule Bowman's points of error.

## V.    Conclusion

We affirm the trial court's judgment.

Ralph K. Burgess
Justice

Date Submitted:    May 26, 2015
Date Decided:    July 1, 2015

17